**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DISTRICT OF COLUMBIA**,<br> 400 6th Street NW<br> Washington, D.C. 20001<br><br> Plaintiff,<br><br> v.<br><br>**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**,<br> 2415 Eisenhower Avenue<br> Alexandria, VA 22314<br><br>**SCOTT TURNER**, *in his Official Capacity as Secretary of Housing and Urban Development*,<br> 2415 Eisenhower Avenue<br> Alexandria, VA 22314<br><br>**UNITED STATES GENERAL SERVICES ADMINISTRATION**,<br> 1800 F Street NW<br> Washington, D.C. 20405<br><br>**EDWARD FORST**, *in his Official Capacity as Administrator of the United States General Services Administration,*<br> 1800 F Street NW<br> Washington, D.C. 20405<br><br>**GOVERNMENT NATIONAL MORTGAGE ASSOCIATION**,<br> 2415 Eisenhower Avenue<br> Alexandria, VA 22314 | Case No.:<br><br>**COMPLAINT** |

**JOSEPH GORMLEY**, *in his Official*
*Capacity as President of the Government*
*National Mortgage Association,*
        2415 Eisenhower Avenue
        Alexandria, VA 22314

**UNITED STATES OF AMERICA**,

        Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      From the time of its establishment in 1965, and for 60 years afterwards, the U.S. Department of Housing and Urban Development (HUD) maintained its headquarters in the District of Columbia.  It was required to do so: HUD's organic statute expressly states that HUD must be "established at the seat of government."  And since the enactment of the Residence Act of 1790, Congress has directed that "[a]ll offices attached to the seat of government shall be exercised in the District of Columbia, and not elsewhere, except as otherwise expressly provided by law."

2.      Nonetheless, earlier this year, HUD began relocating its headquarters from the District of Columbia (the District) to a new location in Alexandria, Virginia.  As of this filing, over 80% of employees have been moved.  And the agency has indicated that it will soon entirely vacate its longtime headquarters at the Robert C. Weaver Federal Building, in the District's Southwest quadrant.

3.      This relocation flatly violates both the Residence Act and HUD's organic statute. Congress could not have been clearer that HUD must maintain its headquarters in "the District of Columbia" unless Congress "expressly provide[s]" otherwise.  Congress has not done so.  The relocation is therefore unlawful.

4.      HUD's move also disregards over two centuries of tradition and practice.  When establishing the District more than 236 years ago, Congress envisioned that the District would

enjoy the benefits of proximity to the federal government, including reliable local economic activity.  Until now, no cabinet agency has been moved out of the District without the express assent of Congress.  The relocation of HUD's headquarters—and, with it, the approximately 2,700 HUD employees who work, eat, shop, and generate tax revenue in the District—marks a startling first, one that will deprive the District of an important economic benefit of its unique status as the seat of the federal government.

5.      Defendants have also ignored their obligations under other federal laws.  They have failed to study the relocation's impact on the District's environment, as required by the National Environmental Policy Act (NEPA).  Among other issues, the move will dramatically alter the commutes of thousands of HUD workers; the shift from a downtown core location amply served by public transit to a suburban location most easily reached by car will predictably cause an increase in vehicle traffic and pollution in and around the District.  NEPA required Defendants to consider these and other impacts before starting the move, but they did not do so.

6.      And Defendants have disregarded their historic preservation obligations: the National Historic Preservation Act (NHPA) and other federal laws require them to prioritize using historic properties for federal office buildings.  Rather than seeking a historic home for HUD, however, Defendants are vacating a property on the National Register of Historic Places and moving to a building completed in 2017, in the Virginia suburbs, without considering the historic options that would have allowed HUD to remain in the District.

7.      Congress established the District of Columbia as the seat of the federal government. If Defendants can move HUD out of the District at will, despite the express location requirements Congress imposed, the federal government will claim free rein to do the same with any other cabinet agency.  The District of Columbia brings this lawsuit to obtain declaratory and injunctive

relief that will stop Defendants' violations of the law and preserve the District's unique status as the seat of the federal government.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. § 1331.

9.      There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201–2202, 5 U.S.C. §§ 704–706, and the Court's equitable powers.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities.  The District of Columbia is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur in the District.

## PARTIES

11.      Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States.  It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government.  The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District, and is responsible for upholding the public interest.  D.C. Code § 1-301.81.

12.      Defendant United States Department of Housing and Urban Development is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 701(b)(1).  HUD is responsible for administering and overseeing programs and funding to provide housing and community development assistance.

13. Defendant Scott Turner is the Secretary of Housing and Urban Development. As Secretary, Defendant Turner is responsible for all actions taken by the agency. He is sued in his official capacity.

14. Defendant United States General Services Administration (GSA) is an agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 701(b)(1). GSA manages and operates federal property, including public buildings owned or leased by the federal government, and oversees the management of historic federal properties. GSA owns the Robert C. Weaver building and is the leaseholder of the building at 2415 Eisenhower Avenue, Alexandria, Virginia.

15. Defendant Edward Forst is the Administrator of the General Services Administration. As Administrator, Defendant Forst is responsible for all actions taken by GSA. He is sued in his official capacity.

16. Defendant Government National Mortgage Association (Ginnie Mae) is a U.S. government-owned corporation within HUD and is an agency within the meaning of 5 U.S.C. § 701(b)(1).

17. Defendant Joseph Gormley is the President of Ginnie Mae. As its President, Defendant Gormley is responsible for all actions taken by Ginnie Mae. He is sued in his official capacity.

18. The United States of America is responsible for the exercise of executive actions by the named Defendants. The United States of America may be named as a defendant in any action seeking relief other than money damages against the United States. *See* 5 U.S.C. § 702.

**LEGAL FRAMEWORK**

**A. The Seat of the Federal Government**

19.     The District Clause of the Constitution vests Congress with the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States." U.S. Const. art. I, § 8, cl. 17.

20.     In 1790, using ceded parts of Maryland and Virginia, Congress established the District of Columbia as the "permanent seat of the government of the United States." Act of July 16, 1790 (Residence Act of 1790), 1 Stat. 130 (codified at 4 U.S.C. § 71). Accordingly, "[a]ll offices attached to the seat of government shall be exercised in the District of Columbia, and not elsewhere, except as otherwise expressly provided by law." 4 U.S.C. § 72.

21.     Congress envisioned that the federal government would bring significant local expenditures, infrastructure improvements, and civil prosperity to the District. Whit Cobb, *Democracy in Search of Utopia: The History, Law, and Politics of Relocating the National Capital*, 99 Dick. L. Rev. 527, 528 (1995); *see Van Ness v. City of Washington*, 29 U.S. 232, 280 (1830) (explaining that the establishment of the District as the nation's capital "was of itself a most valuable consideration" for property owners who "expect[ed] to derive" "great benefits . . . from having the federal city laid off upon their lands"); The Federalist No. 43 (Madison) (anticipating that "the inhabitants" of the territory ceded to the District "will find sufficient inducements of interest to become willing parties to the cession").

22.     In 1846, Congress passed the Retrocession Act, which returned portions of the District, including the modern-day City of Alexandria, to Virginia. *See* Act of July 9, 1846, ch.

35, 9 Stat. 35.  Alexandria has therefore not been part of the "seat of government" for nearly 180 years.

23.    In addition to the Residence Act itself, Congress has long mandated that agencies be located "at the seat of government" in their organic statutes.  *See, e.g.*, 42 U.S.C. § 3532(a) (HUD); 7 U.S.C. § 2201 (Department of Agriculture); 15 U.S.C. § 1501 (Department of Commerce); 42 U.S.C. § 7131 (Department of Energy); 43 U.S.C. § 1451 (Department of the Interior); 28 U.S.C. § 501 (Department of Justice); 22 U.S.C. § 2651 (Department of State); 31 U.S.C. § 301(a) (Department of the Treasury).

24.    Other statutes expressly provide for federal agencies to operate "in the District of Columbia."  *E.g.*, 38 U.S.C. § 314 ("The Central Office of the Department [of Veterans Affairs] shall be in the District of Columbia."); 29 U.S.C. § 558 (authorizing expenditures for "rental of appropriate quarters for the accommodation of the Department of Labor within the District of Columbia").

25.    And even where an agency's organic statute does not expressly include a requirement to locate in the District, Congress and the Executive Branch have respected the District's status as the "seat of government" by establishing the agency's headquarters here.  This includes the Department of Education, 20 U.S.C. § 3411; the Department of Health and Human Services, 42 U.S.C. § 3501; and the Department of Homeland Security, 6 U.S.C. § 111; *see also* Reorg. Plan No. 1 of 1953, 67 Stat. 631 (HHS predecessor agency).

26.    The Executive Branch has long adhered to the requirements of the Residence Act and other statutes requiring agencies to operate in the District.  Until this year, every agency whose offices are attached by statute to the "seat of government" has maintained its headquarters in the District.  And in the rare circumstances in which the Executive Branch has attempted to relocate

an agency's headquarters outside of the District, it has secured Congress's express approval before doing so.

27.    For nearly 80 years, the only cabinet-level agency to maintain its headquarters outside of the District has been the Department of Defense.  Congress authorized the agency to construct what is now the Pentagon and relocate to Arlington, Virginia, just before the start of the Second World War.  *See* 1st Suppl. Nat'l Defense Approps. Act, 1942, Pub. L. No. 77-247, 55 Stat. 669, 685–86 (1941).

28.    Congress has also authorized other agencies to locate outside of the District, including the Central Intelligence Agency, Act of July 15, 1955, Pub. L. No. 84-161, § 401, 69 Stat. 324, 349; the Nuclear Regulatory Commission (then called the Atomic Energy Commission), Act of May 6, 1955, Pub. L. No. 84-31, 69 Stat. 47, 47; and the U.S. Patent and Trademark Office, 35 U.S.C. § 1(b).  Each of these statutes gave express authorization for the relevant move before it occurred.

**B.  Congress Established HUD and Ginnie Mae at the Seat of Government**

29.    The Housing and Home Finance Agency (HHFA) was established in 1947 to consolidate multiple federal agencies with housing portfolios into one overarching housing agency.  *See* Reorg. Plan No. 3 of 1947, 61 Stat. 954.  From 1947 through 1964, the HHFA operated out of various office buildings located within the District.

30.    In 1964, Congress authorized and appropriated funds for the construction of a "Housing and Home Finance Agency [HHFA] building" in the District of Columbia.  Act of Aug. 30, 1964, Pub. L. No. 88-507, 78 Stat. 640, 651 (1964).

Case 1:26-cv-02636-RBW    Document 1    Filed 07/27/26    Page 9 of 30

31.     In 1965, President Lyndon B. Johnson signed legislation establishing HUD.  Act of Sept. 9, 1965, Pub. L. No. 89-174, 79 Stat. 667 (1965) (codified at 42 U.S.C. § 3532).  Once HUD was created, it superseded the HHFA.

32.     HUD's organic statute provides that "[t]here is hereby established at the seat of government an executive department to be known as the Department of Housing and Urban Development."  42 U.S.C. § 3532(a).

33.     The Weaver Building site was chosen and developed to house this new agency's headquarters.  Located at 451 7th Street in Southwest Washington, D.C., this building has served as HUD's headquarters since construction was completed in 1968.

34.     In 1999, Congress enacted legislation naming the building after the first HUD secretary, Robert C. Weaver.  Act of Dec. 9, 1999, Pub. L. No. 106-162, 113 Stat. 1777.  In that legislation, Congress described the building as the "headquarters building of the Department of Housing and Urban Development located at 451 Seventh Street, SW., in Washington, District of Columbia."  *Id.*

35.     Ginnie Mae is a government-owned housing finance corporation within HUD.  In Ginnie Mae's organic statute, Congress similarly required the agency to "maintain its principal office in the District of Columbia."  12 U.S.C. § 1717(a)(1).  Until this year, Ginnie Mae had maintained its headquarters in the District, most recently at the Capitol View Building, 425 3rd Street SW.

36.     Congress has not enacted legislation authorizing HUD or Ginnie Mae to move its headquarters outside of the District.

## C.  The General Services Administration

37.    The General Services Administration was established pursuant to the Federal Property and Administrative Services Act of 1949, Pub. L. No. 152, Ch. 288, 63 Stat. 377, 379. GSA oversees the operations and management of federal property, including public buildings owned or leased by the federal government.

38.    The GSA Administrator is empowered to "assign or reassign space for an executive agency in any Federal Government-owned or leased building."  40 U.S.C. § 584(a)(1).  The Administrator's authority to reassign space "may be exercised only . . . on a determination by the Administrator that the assignment or reassignment is advantageous to the Government in terms of economy, efficiency, or national security."  *Id.* § 584(a)(2)(C).

39.    Like every federal agency, GSA is bound by federal statutes, including the Residence Act and the organic statutes for HUD and Ginnie Mae.

## D.  National Environmental Policy Act

40.    The National Environmental Policy Act requires federal agencies to assess the environmental impact of a proposed "major Federal action" that will "significantly affect[] the human environment."  42 U.S.C. § 4332(C).  Before making a final decision, an agency must evaluate the reasonably foreseeable environmental effects of the proposed action and consider "a reasonable range of alternatives."  *Id.* § 4332(C)(iii).

41.    NEPA sets forth two levels of environmental review.  An agency "shall issue" an "environmental impact statement" (EIS) when a proposed agency action will have "a reasonably foreseeable significant effect on the quality of the human environment."  *Id.* § 4336(b)(1).  And an agency "shall prepare" an "environmental assessment" (EA) when a proposed agency action "does not have a reasonably foreseeable significant effect on the quality of the human environment," or

when "the significance of such effect is unknown," unless a categorical exclusion applies. *Id.* § 4336(b)(2).

42. When two or more agencies are involved in a major federal action, the agencies must identify one to lead the NEPA review process in coordination with the others. *Id.* § 4336a(a)(1)(A). GSA has acted as the lead agency for the purposes of NEPA review in federal office relocations.

43. In 1999, GSA promulgated comprehensive guidance implementing NEPA in the form of the Public Buildings Service NEPA Desk Guide (Desk Guide, attached as Ex. A).[1] *See* 65 Fed. Reg. 69558 (Nov. 17, 2000) (announcing publication of final revised GSA internal procedures implementing NEPA, including the Desk Guide, with effective date of October 19, 1999). The Desk Guide is a precisely reticulated, 208-page document embodying and directing GSA's policy of "attend[ing] carefully to the National Environmental Policy set forth" in NEPA "[i]n all its decisionmaking." *Id.* at 69559.

44. The Desk Guide provides a comprehensive definition for the "human environment" that must be considered under NEPA: "The term human environment includes the biophysical environment—that is, the natural world around us, the architectural or built environment, and the environment's social, cultural, and economic aspects, its aesthetics, and its implications for human health." Ex. A, Desk Guide at 3-1.

45. The Desk Guide goes on to enumerate dozens of factors GSA should consider when determining whether to prepare an environmental impact statement or an environmental

---

[1] The Desk Guide is no longer available online, but it was when the decisions challenged in this Complaint were made. And GSA continues to rely on the Desk Guide in its NEPA analyses. *See, e.g.*, Notice of Intent to Prepare an EIS, 91 Fed. Reg. 42449 (July 9, 2026) (citing the Desk Guide in preparing an EIS for a proposed expansion of federal property).

assessment, and whether a categorical exclusion applies. *Id.* at 3-6 to 3-9. In all circumstances, the Desk Guide directs GSA to first determine the purpose and need for the action, to define its scope, and to identify alternatives. *Id.* at 3-6 to 3-7, 3-9. Unless an automatic categorical exclusion applies, the agency must also always evaluate the proposal's potential impact on the natural, economic, and sociocultural environment. *Id.* at 3-6 to 3-9. The Desk Guide also directs GSA to seek public input as part of the NEPA process.

46. Consistent with these requirements, GSA has conducted environmental reviews ahead of large agency relocations. For example, in 2020, GSA prepared an environmental assessment before moving the Bureau of Labor Statistics and its 1,800 employees from the District of Columbia to the Suitland Federal Center in Suitland, Maryland.[2] And in 2021, when GSA proposed to relocate 3,000 employees from a federal building in Southern California to other space nearby, it prepared a full environmental impact statement.[3]

47. Like other federal agencies, HUD has also adopted regulations implementing NEPA. *See* 24 C.F.R. § 50.1 *et seq.* These regulations require HUD to conduct an environmental study before undertaking most actions and to memorialize that study in a written report.

**E. Historic Preservation Requirements**

48. The National Historic Preservation Act requires the "head of each Federal agency [to] assume responsibility for the preservation of historic property that is owned or controlled by the agency." 54 U.S.C. § 306101(a)(1).

---

[2] U.S. Dep't of Labor Bureau of Labor Statistics Relocation, Final EA (GSA 2020), https://www.gsa.gov/system/files/BLS_Final_Final_EA_508_(3).pdf (BLS EA).
[3] Final EIS for the Chet Holifield Fed. Bldg. Tenant Relocation, Laguna Nigel, Cal. (GSA 2021), https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/search (search for documents containing "Chet Holifield" in the title) (Chet Holifield EIS).

49.     The NHPA also provides that, "[p]rior to acquiring, constructing, or leasing a building for purposes of carrying out agency responsibilities, a Federal agency shall use, to the maximum extent feasible, historic property available to the agency, in accordance with Executive Order No. 13006 (40 U.S.C. § 3306 note)."  54 U.S.C. § 306101(a)(2).

50.     Executive Order 13006 requires agencies to prioritize certain conditions when siting buildings.  Agencies must "give first consideration to historic properties within historic districts"; then, "[i]f no such property is suitable, . . .  Federal agencies shall consider other developed or undeveloped sites within historic districts."  Exec. Order No. 13006, § 2, 61 Fed. Reg. 26071 (May 24, 1996).  If the first two conditions cannot be met, "Federal agencies shall then consider historic properties outside of historic districts[.]"  *Id.*

51.     In 2025, President Trump attempted to revoke Executive Order 13006 through Executive Order 14274, "Restoring Common Sense to Federal Office Space Management."  *See* 90 Fed. Reg. 16445, § 2(b) (Apr. 18, 2025).  But Congress has not amended the NHPA to remove the reference to Executive Order 13006, and thus the Executive Order's requirements remain incorporated by reference.  *See Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 119 (1947) (incorporation of Executive Order in statute constitutes ratification by Congress).

52.     Defendant GSA also has a statutory obligation to prioritize the use of historic buildings.  Under 40 U.S.C. § 3306(b)(1), GSA must "acquire and utilize space in suitable buildings of historical, architectural, or cultural significance unless use of the space would not prove feasible and prudent compared with available alternatives."

53.     And, at the time Defendants announced HUD's move to Virginia, GSA's regulations required agencies to prioritize the use of historic properties.  *See* 41 C.F.R. § 102-79.60 ("Are agencies required to use historic properties available to the agency?  Yes, Federal agencies

13

must assume responsibility for the preservation of the historic properties they own or control. Prior to acquiring, constructing or leasing buildings, agencies must use, to the maximum extent feasible, historic properties already owned or leased by the agency.").[4]

## FACTUAL ALLEGATIONS

### A. Relocation Announcement

54. Since 1968, HUD has been headquartered at the Robert C. Weaver Building in the District of Columbia. The Weaver Building, an imposing Brutalist structure near L'Enfant Plaza, was commissioned and built to house HUD's headquarters. It is listed in the National Register of Historic Places.

55. According to HUD, in 2025, over 2,700 employees were based at its headquarters. HUD Announces New Headquarters, Ending Era of Costly Repairs, Health Hazards, https://perma.cc/6J4L-E5VL (HUD Announcement).

56. On June 25, 2025, Defendants issued a press release to "announce[] the relocation of HUD headquarters" from the Weaver building to 2415 Eisenhower Avenue, Alexandria, Virginia (2415 Eisenhower). *Id.* The HUD Secretary, Defendant Turner, declared that it was "time to turn the page on the Weaver Building and relocate to a new headquarters." *Id.*

57. At a press conference that same day celebrating "The New Golden Age of HUD," then-Governor of Virginia Glenn Youngkin commented, "It's not every day—in fact, I don't think it's been ever—that a federal, cabinet-level agency has moved its headquarters to Virginia."[5] Michael Peters, then-Commissioner of Defendant GSA's Public Buildings Service, underscored

---

[4] The regulation was withdrawn in December 2025. 90 Fed. Reg. 58408, 58409 (Dec. 16, 2025).
[5] HUDchannel, Live: The New Golden Age of HUD | Secretary Turner Unveils HUD's New Building (YouTube, June 25, 2025), https://www.youtube.com/watch?v=ZdctWVC7LQM (2:58–3:08).

the point, noting that "HUD will be the first major agency headquarters relocation in the Trump Administration's effort to right-size our federal real estate portfolio."[6]

58.    Defendants HUD and GSA claimed that moving HUD's headquarters would save taxpayer dollars.  They stated that the Weaver Building "would require nearly half a billion dollars over the next four years to meet minimum federal standards."  HUD Announcement.

59.    Defendants cited no evidence for these statements, which contradict a 2024 analysis conducted by GSA and HUD finding that Weaver could be repaired for $21.7 million, that there were "no feasible alternatives" to making these repairs, and that the "cost of the proposed project is far less than the cost of leasing or constructing a new building."[7]  Nor did Defendants address the disruptions to everything from commuting and traffic patterns to the local economy of the District that relocating a major agency headquarters would cause.

60.    When HUD announced that its headquarters was moving to 2415 Eisenhower, the National Science Foundation (NSF) had occupied the building since construction was completed in 2017.  In November 2025, NSF and Defendant GSA announced that the NSF's approximately 1,600 employees at 2415 Eisenhower would move to another building in Alexandria.[8]

61.    In late 2025, Defendants announced that HUD staff located at the Weaver Building would be relocated to 2415 Eisenhower on a staggered basis.

62.    In or around March 2026, HUD stated that it intended to move Ginnie Mae and 20 HUD program offices to 2415 Eisenhower by early April 2026.

---

[6] *Id.* 9:06–9:15.
[7] GSA, Prospectus-Alteration, Robert C. Weaver Federal Building (Apr. 1, 2024) 3, https://perma.cc/C8ZV-T4PQ (GSA Prospectus).
[8] GSA and NSF Announce NSF Headquarters Relocation to Modern, Right-Sized, and Mission-Ready Space, https://perma.cc/6NGY-HV48.

63.     As of the date of this filing, more than 80% of HUD headquarters employees have been assigned to the Alexandria office.[9]  Most Ginnie Mae employees have also been relocated.

64.     Defendant HUD has stated that HUD and Ginnie Mae will maintain "executive space" at the Potomac Center Plaza in the District in order "to meet their respective statutory requirements."[10]  Defendants have not explained which or how many employees will work in this space, whether permanently or temporarily, and they have not characterized it as the agencies' headquarters.

**B.  Congress Did Not Authorize HUD or Ginnie Mae to Relocate Outside the District**

65.     Congress has not authorized an exception to the Residence Act or to HUD's or Ginnie Mae's organic statutes that would permit HUD or Ginnie Mae to relocate their headquarters outside the District of Columbia.

66.     Congress also has not appropriated funding for HUD's move.  HUD reportedly paid more than $26 million for the NSF move but has not been responsive to Congressional inquiries regarding the overall budget, timeline, and analysis supporting its decision to move to 2415 Eisenhower.  In February 2026, ranking members of three Senate Appropriations subcommittees requested a Government Accountability Office (GAO) review of HUD's move, citing these and other concerns.  Ex. C, Senators' GAO Letter.

---

[9] *See* Ex. B, Sarah Holder, HUD's Plan to Leave DC Faces Legal Challenge, Bloomberg Government (July 9, 2026).

[10] Ex. C, Letter from Sens. Kirsten Gillibrand, Jack Reed, and Chris Van Hollen to Orice Williams Brown, Acting Comptroller General of the United States (Feb. 13, 2026), at 1, (Senators' GAO Letter).

67.     The President's proposed FY 2027 budget includes a request to amend Ginnie Mae's organic statute to permit the agency to maintain its principal offices outside of the District.[11] The budget proposal does not contain a similar request for HUD.

68.     In March 2026, three U.S. Senators wrote to Defendant Turner seeking information and answers about the headquarters relocation, including the legal basis for the move, the cost of the move to date, and the number of staff that will remain in the District.[12] Defendants Turner and HUD have not publicly responded.

## C. Defendants Violated NEPA

69.     As explained above, the National Environmental Policy Act requires federal agencies to analyze the environmental impacts of a "major Federal action" that will "significantly affect[] the human environment" before undertaking that action.  42 U.S.C. § 4332(C).

70.     Moving HUD's and Ginnie Mae's headquarters to Virginia is a major federal action that will significantly affect the human environment in the District and in Alexandria, and so an environmental analysis was required.

71.     No categorical exclusion applies to this relocation.  While the GSA Desk Guide does identify the "[r]elocation of employees into existing Federally controlled space," as a potential automatic categorical exclusion, that exception applies only if the relocation "does not involve a substantial change in the number of employees or motor vehicles." Ex. A, Desk Guide at 5-1.  By replacing NSF's 1,600 employees with HUD's 2,700 employees, Defendants have

---

[11] Off. of Mgmt and Budget, Exec. Office of the President, Appendix, Budget of the United States Government: Fiscal Year 2027 at 606, Sec. 235 (2026), https://perma.cc/L84D-BMEA.
[12] Letter from Sens. Chris Van Hollen, Angela Alsobrooks & Elizabeth Warren to Sec'y Scott Turner (Mar. 26, 2026), https://perma.cc/B76R-YRA9.

increased the number of employees at 2415 Eisenhower by nearly 70%. This is a "substantial change in the number of employees" and, likely, motor vehicles.

72. Defendants did not conduct an environmental study before relocating HUD and Ginnie Mae to 2415 Eisenhower, as required by NEPA and their own guidance and regulations.

73. The District is harmed by Defendants' failure to study and seek public input on the impacts of the relocation decision on the human environment, including "the natural world . . . , the architectural or built environment, and the environment's social, cultural, and economic aspects, its aesthetics, and its implications for human health," as they were required to do. *See* Ex. A, Desk Guide at 3-1.

74. Some of these impacts are easily foreseeable. For instance, the relocation will alter the commuting patterns of thousands of workers and is likely to increase vehicle traffic and related pollution in and around the District of Columbia.

75. HUD headquarters employees are generally required to report in person to the office every workday. They live across the region, in Maryland, Virginia, and the District.

76. The Weaver Building is easily accessed by public transit. It is located by the L'Enfant Plaza station, which is a transfer point for five Metrorail lines and the terminus for the Virginia Railway Express commuter train. It is also a short Metro ride from Union Station, the terminus for Maryland commuter trains. And it is accessible by bicycle and bus.

77. By contrast, 2415 Eisenhower is most easily accessed by car; its location is adjacent to the Capital Beltway and other major thoroughfares. The building is served by only one Metrorail line and, given the proximity of several highways and large roads, it is not as accessible to cyclists. HUD employees are therefore more likely to commute by car, and many will see—or

have now seen—their commuting times increase significantly. These changes will affect traffic patterns and air pollution in and around the region, including in the District.

78.     A recent survey of HUD headquarters employees underscores these concerns. In a survey of all employees by the local AFGE union, 67% of respondents reported that they used public transportation, walking, or biking to get to the Weaver building, and only 12.7% reported that they typically commuted by car. In addition, over 60% expected the move to increase their commutes by at least 30 minutes.

79.     Defendants' failure to analyze these and other likely impacts, as required by NEPA, is inconsistent with their own past practice. For example, in its 2020 environmental assessment of the proposed move of the Bureau of Labor Statistics from the District to federal space in Maryland, GSA conducted a detailed analysis of traffic impacts, estimating the increase in car commutes, considering all routes cars could use to access the new site, and analyzing the impacts of traffic congestion. BLS EA at 3-23 to 3-27. It also considered impacts on public transportation and pedestrian and bicycle access. *Id.* at 3-28 to 3-31. And GSA considered impacts to other aspects of the "human environment," like community facilities, air quality, and the District's economy. *Id.* at 3-10 to 3-22, 3-31 to 3-33. Notably, GSA also integrated analysis of considerations under the National Historic Preservation Act into the environmental assessment. *Id.* at 1-1.

80.     Similarly, in 2021, GSA prepared an environmental impact statement for a proposed move of approximately 3,000 federal employees out of a federal building in Laguna Niguel, California. Chet Holifield EIS at 2-1. Among other impacts, GSA considered the impact of the proposed move on local traffic and the local economy. *See id.* at 3-22 to 3-32, 3-71 to 3-78. GSA also evaluated potential impacts to cultural resources; air quality and greenhouse gas emissions; land use; utilities and infrastructure; and more. *Id.* at Table ES-1. And even though it

was not part of the proposed action, GSA considered impacts on the building itself, which is a Brutalist structure eligible for inclusion on the National Register, because disposal of the building was a reasonably foreseeable consequence of the proposal.  *Id.* at 3-3 to 3-10, ES-3 to ES-4.

### D.  Defendants Violated Historic Preservation Requirements

81.    Defendants had an obligation under the National Historic Preservation Act, 40 U.S.C. § 3306, and 41 C.F.R. § 102-79.60 to prioritize historic properties when siting buildings. But they have not explained whether they considered historic properties in the District for re-siting HUD's headquarters, or, if they did, why they rejected them.

82.    In fact, the minimal information HUD has provided indicates that Defendants only considered one historic building—the Cohen Building, at 330 Independence Avenue SW—as a potential alternative site for HUD's headquarters.  *See* Ex. C, Senators' GAO Letter at 2–3. Defendants have not explained whether and why the Cohen Building was the only historic property in the District under consideration for HUD's relocation, or why they rejected it.

### E.  Defendants Have Not Explained Their Decision to Relocate HUD Outside the District

83.    While Defendants have expressed dissatisfaction with the Weaver Building itself, they have provided no explanation for their decision to relocate HUD's headquarters entirely outside of the District.  Defendants have not made any public statements or released any assessments indicating that they meaningfully considered the available office space within the District of Columbia.

84.    In contrast, Defendants HUD and GSA in recent years have released budgets and assessments related to proposals for renovating the Weaver Building.  In 2024, GSA published a proposal for a $21.7 million repair and alteration project for the Weaver Building that included "waterproofing, plumbing, and architectural and structural repairs."  GSA Prospectus at 1.  The

proposal included a breakdown of estimated construction costs and a justification for the project, which referred to a 2022 study that "identified extensive leaking and structural damage" and included a detailed overview of how the leak locations were identified. *Id.* at 2. At the time, GSA also stated that there were "no feasible alternatives to this project," and noted that the "cost of the proposed project is far less than the cost of leasing or constructing a new building." *Id.* at 3.

85.    In addition, in its Capital Plan for 2024-2028, Defendant HUD included cost estimates and justifications for consolidating satellite offices, addressing deferred maintenance, and optimizing employee use of office space at the Weaver Building.[13] Defendants have not explained why this Capital Plan can no longer be implemented.

**F.    The Relocation of HUD Headquarters Outside the District Will Harm the District**

86.    The 2,700 employees at the Weaver Building have been an important source of economic activity in the District's Southwest quadrant. Employees who work in the District patronize local businesses, buy lunch and run errands in the District, and socialize in local bars and restaurants after work. Contractors working at the Weaver Building also contribute in the same ways to the local sales tax base.

87.    Ginnie Mae employees, until recently located in the Capitol View Building, similarly contributed to economic activity in the District's Southwest quadrant.

88.    Local businesses—including restaurants, convenience stores, salons, operators of parking garages, and other retailers—rely on HUD employees' foot traffic to generate revenue, which also generates sales tax revenue for the District.

89.    The District anticipates that the relocation of HUD's workforce will cost the District nearly $2 million in sales tax revenue annually.

---

[13] *See* HUD, Capital Plan 2024–2028 at 7 (Dec. 16, 2022), https://perma.cc/BSL4-VWL4.

90.     This revenue is precisely the type of economic benefit Congress contemplated flowing to the District when it designated the District as the seat of the federal government 236 years ago.

91.     If HUD and Ginnie Mae can disregard the will of Congress and leave the District despite the requirements of the Residence Act and their own organic statutes, other federal agencies under the same requirements may feel empowered to do the same.  This would deprive the District of resources and further undermine the District's congressionally designated role as the seat of the federal government.

92.     The District is also harmed by Defendants' violations of NEPA.  Defendants' decision to move two agencies out of the District will certainly and predictably have a significant impact on the human environment.  And, as GSA has previously done in similar circumstances, Defendants were required to comprehensively evaluate the environmental impact of the relocations before they began, and to consider public input.

93.     The changes to commuting patterns alone will have a readily foreseeable environmental impact.  The likely increase in car commutes will increase air pollution in the region.  And it will create more traffic congestion on the region's already-crowded roads, highways, and bridges.  Car commuters traveling to 2415 Eisenhower are likely to use Route I-95, I-495, DC-295 South, and the Wilson Bridge to get there.  In 2022, the regional traffic planning board identified the relevant stretches of these roadways as among the top ten bottlenecks in the D.C. area.[14]  The relocation of HUD's and Ginnie Mae's headquarters will only exacerbate this congestion.

---

[14] *See* Nat'l Capital Region Transp. Planning Bd, Congestion Report, 4th Quarter 2022, at 3 (Jan. 2023); https://perma.cc/XSG9-K6A6.

94.     Finally, the District is harmed by Defendants' failure to meaningfully consider opportunities to relocate the agencies' headquarters to historic buildings, as required by the NHPA and GSA's statute and regulations.  Defendants are moving HUD out of a historic building in a historic district—the Weaver Building—into a building completed in 2017, that is neither a historic property nor located in an historic district.  In so doing, Defendants failed to meaningfully consider whether other historic locations in the District were available and appropriate.

## CAUSES OF ACTION

### COUNT I
### Violation of the Administrative Procedure Act
### Contrary to Law – Residence Act and Agency Organic Statutes
### (All Defendants)

95.     The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

96.     Under the Administrative Procedure Act (APA), a court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C)-(D).

97.     Defendants HUD, GSA, and Ginnie Mae are agencies subject to the APA.  5 U.S.C. § 701(b)(1).

98.     Defendants took final agency actions that are subject to judicial review when they decided to relocate the headquarters of HUD and Ginnie Mae, and the thousands of employees who work there, from the District of Columbia to Virginia.

99.     Defendants have violated the Residence Act and the organic statutes for HUD and Ginnie Mae by moving the headquarters for HUD and Ginnie Mae outside of the "seat of

23

government."  HUD and Ginnie Mae are statutorily required to maintain their headquarters within the District of Columbia unless Congress expressly authorizes otherwise, which it has not done.

100.    By violating the Residence Act and the organic statutes for HUD and Ginnie Mae, Defendants have acted in violation of law, in excess of their statutory authority, and without observance of procedure required by law, in violation of the APA.

101.    The District is entitled to vacatur of Defendants' final agency actions, a declaration that the relocation decisions are unlawful, and a permanent injunction prohibiting the relocation of HUD's and Ginnie Mae's headquarters outside of the District of Columbia.

**COUNT II**
**Violation of the Administrative Procedure Act**
**Contrary to Law – National Environmental Policy Act**
**(All Defendants)**

102.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

103.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C)-(D).

104.    NEPA requires federal agencies to assess the impact of "major Federal actions" that will "significantly affect[] the human environment" prior to undertaking them.  42 U.S.C. § 4332(C).

105.    Defendants took final agency actions that are subject to judicial review when they decided to relocate the headquarters of HUD and Ginnie Mae, and the thousands of employees who work there, from the District of Columbia to Virginia.

106. The relocation is also a major federal action that will significantly affect the human environment in the District. The change in commuting patterns for 2,700 workers, alone, will inevitably affect local vehicle traffic congestion and pollution across the region.

107. Defendants' failure to conduct an environmental review prior to initiating the HUD and Ginnie Mae headquarters relocations violates NEPA.

108. By violating NEPA, Defendants have acted in violation of law, in excess of their statutory authority, and without observance of procedure required by law, in violation of the APA.

109. The District is entitled to vacatur of Defendants' relocation decisions, a declaration that the actions are unlawful, and a permanent injunction requiring Defendants to undertake the analysis required by NEPA.

**COUNT III**
**Violation of the Administrative Procedure Act**
**Contrary to Law – National Historic Preservation Act**
**(All Defendants)**

110. The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

111. Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D).

112. The National Historic Preservation Act requires federal agencies to "use, to the maximum extent feasible, historic property available to the agency," and to prioritize historic properties in historic districts in accordance with Executive Order 13006. 54 U.S.C. § 306101.

25

113.    In addition, 40 U.S.C. § 3306 and GSA's regulations at 41 C.F.R. § 102-79.60, which were operative at the relevant time, mandate that GSA acquire and use historic properties whenever "feasible."

114.    Defendants ignored these requirements.  Instead, they moved HUD out of a historic building in a historic district—the Weaver building—and into 2415 Eisenhower, which completed construction in 2017 and is neither historic nor located in a historic district.

115.    Defendants also ignored these requirements by failing to prioritize relocating Ginnie Mae into a historic building in a historic district.

116.    It was plainly "feasible" to keep HUD in the Weaver building.  And Defendants failed to meaningfully consider whether other historic properties in historic districts, including those within the District, were available and "feasible."

117.    By violating the NHPA, 40 U.S.C. § 3306, and 41 C.F.R. § 102-79.60, Defendants have acted in violation of law, in excess of their statutory authority, and without observance of procedure required by law, in violation of the APA.

118.    The District is entitled to vacatur of Defendants' relocation decisions, a declaration that the actions are unlawful, and a permanent injunction requiring Defendants to undertake the analysis required by the NHPA.

**COUNT IV**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action**
**(All Defendants)**

119.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

26

120. Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

121. An agency action is arbitrary or capricious where the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

122. An agency must, at a minimum, consider alternatives and "important aspect[s] of the problem," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020) (citations and internal quotation marks omitted).

123. An agency's "failure even to acknowledge its past practice and formal policies . . . let alone to explain its reversal of course" is arbitrary and capricious. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017).

124. Defendants' actions, including their opaque decision-making process and rushed implementation of the agency relocations, are arbitrary and capricious for several reasons, including the following:

   a. Defendants failed to provide a reasoned explanation for relocating HUD's and Ginnie Mae's headquarters outside of the District, and what little explanation they gave is flatly contradicted by Defendants' own recent cost-benefit analyses and conclusions.

27

b. Defendants failed to acknowledge or explain their departure from the longstanding practice of maintaining these federal agency headquarters in the District of Columbia.

c. Defendants failed to meaningfully consider alternatives, including other locations within the District.

d. Defendants failed to consider and weigh the District's reliance interest in its status as the permanent seat of the federal government.

e. Defendants failed to consider tangible costs to the District, including an annual loss of nearly $2 million in sales tax revenue.

125. Defendants' failure to study the impact of the relocation of two federal agency headquarters on the human environment of the District, as required by the APA and NEPA, was arbitrary, capricious, and an abuse of discretion for several reasons, including the following:

a. Defendants failed to explain their departure from past practice. GSA has previously conducted comprehensive environmental studies prior to initiating federal agency office relocations. In those similar instances, GSA and the relevant agency closely examined the impact of the federal office relocation on numerous aspects of the human environment, including traffic, roadways, air quality, transit systems, and more. Defendants have not explained why they did not conduct a similar evaluation here.

b. Defendant GSA failed to abide by its own longstanding guidance without explanation.

c. Defendants failed to meaningfully consider alternatives, including not relocating the agencies' headquarters, or relocating them within the District.

28

126. Defendants' failure to abide by historic preservation requirements was also arbitrary and capricious. Defendants have not explained what, if any, criteria they applied when selecting 2415 Eisenhower as the new headquarters location for HUD and Ginnie Mae. Nor have they explained what alternatives, if any, they considered. And they have offered no rationale for their failure to meaningfully consider historic properties in historic districts when reaching that decision.

127. For all these and other reasons, Defendants have acted arbitrarily and capriciously, in violation of 5 U.S.C. § 706.

128. The District is entitled to vacatur of Defendants' relocation decisions, a declaration that the actions are unlawful, and a permanent injunction prohibiting Defendants from relocating the agencies' headquarters out of the District and requiring Defendants to undertake the analyses required by NEPA and the NHPA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff District of Columbia respectfully requests that the Court:

A. Declare that Defendants have acted contrary to federal law by:

    i. Violating the Residence Act of 1790, 42 U.S.C. § 3532, and 12 U.S.C. § 1717 by relocating the headquarters of HUD and Ginnie Mae outside of the District of Columbia;

    ii. Failing to conduct the environmental study required by the National Environmental Policy Act prior to initiating the relocations of HUD's and Ginnie Mae's headquarters; and

iii.     Failing to prioritize the use of historic properties in historic districts and otherwise comply with the requirements of the National Historic Preservation Act, 40 U.S.C. § 3306, and 41 C.F.R. § 102-79.60;

B.     Enjoin the relocation of the headquarters of HUD and Ginnie Mae outside the District;

C.     Stay such actions pursuant to 5 U.S.C. § 705;

D.     Vacate such actions pursuant to 5 U.S.C. § 706; and

E.     Award such additional relief as the interests of justice may require.


Dated: July 27, 2026                          Respectfully submitted,

                                              BRIAN L. SCHWALB
                                              Attorney General for the District of Columbia

                                              /s/ Eliza H. Simon
                                              ELIZA H. SIMON (D.C. Bar No. 90035651)
                                              MITCHELL P. REICH (D.C. Bar No. 1044671)
                                              Senior Counsels to the Attorney General

                                              /s/ Nicole S. Hill
                                              NICOLE S. HILL (D.C. Bar No. 888324938)
                                              CARA SPENCER (D.C. Bar No. 1023182)
                                              Assistant Attorneys General
                                              Office of the Attorney General for
                                              the District of Columbia
                                              400 6th Street NW
                                              Washington, D.C. 20001
                                              Tel: (202) 727-4171
                                              nicole.hill@dc.gov


                                              *Attorneys for the District of Columbia*