# Exhibit C

February 13, 2026

The Honorable Orice Williams Brown
Acting Comptroller General of the United States
Government Accountability Office
441 G St., NW
Washington, DC 20548

Dear Ms. Brown:

We write to you today to request that the Government Accountability Office conduct a review of the Department of Housing and Urban Development's (HUD's) decision to move HUD's headquarters from the Weaver Building to 2415 Eisenhower Avenue in Alexandria, Virginia. Specifically, we ask that you assess the processes HUD, the General Services Administration (GSA) and National Science Foundation (NSF) used to ensure it adhered to the laws, regulations, and policies governing space and employee management, and whether the decision raises other concerns of fraud, waste, abuse, political malfeasance, and mismanagement.

On June 25, 2025, HUD Secretary E. Scott Turner stood alongside former Virginia Governor Glenn Youngkin and the GSA Public Buildings Service Commissioner Michael Peters to announce[1] the Trump Administration's decision to move HUD's headquarters to Alexandria and displace nearly 2,000 employees of the NSF to a new, not-yet-determined location. Immediately following the announcement, the Senate and House Committees on Appropriations (Committees) sent a lengthy list of questions to HUD and GSA regarding the costs, budget and funding sources, timeline, and analysis supporting the decision. The agencies were unable to answer most questions at that time – raising concerns about the decision-making process and now rushed execution. Months later, HUD continues to only provide piecemeal and partial responses to the Committees as well as its own staff.

One core unresolved concern is the legality of the move. The HUD Act (42 U.S.C. § 3532(a)) establishes HUD "at the seat of government", a term defined in 4 U.S.C. §§ 71–72 as the District of Columbia and used across multiple agency authorizations. Offices attached to the seat of government must "be exercised in the District of Columbia[2], and not elsewhere, except as otherwise expressly provided by law," which Congress has not[3]. Moreover, the law explicitly requires Ginnie Mae to maintain its "principal office in the District of Columbia" (12 U.S.C. § 1717(a)(2)(A)). In response to the Committees' inquiries about these requirements, HUD provided only one sentence, "HUD and Ginnie Mae will maintain executive space at the Potomac Center location in the District of Columbia with a smaller footprint to meet their respective statutory requirements".

[1] https://www.hud.gov/news/hud-no-25-085
[2] Congressional Research Service. (2004, July 14). Location of Federal Government Offices. https://www.everycrsreport.com/files/20040714_RS21390_e723fb0b6ba977fc993aa341266cf33bac949b64.pdf
[3] Senate Report 119-47 notes that HUD did not request any fiscal year 2026 funds for the move, and thus, no funds have been approved for the move. https://www.congress.gov/119/crpt/srpt47/CRPT-119srpt47.pdf.

While the condition of the Weaver Building and the unaddressed maintenance backlog has long been a concern for the Senate Committee on Appropriations[4], a decision of this magnitude – implicating tens of millions of taxpayer dollars and directly impacting thousands of employees and their families – warrant thoughtful deliberation and employee involvement, as the Senate Committee on Appropriations stated in its fiscal year 2025 report[5]. The first preliminary budget provided by HUD in July 2025 included several "TBD" placeholders, since no decision had been made at the time about whether this was a "forced move" under then-applicable GSA regulations[6] and which agency would be responsible for which costs. The next budget update provided in December 2025 showed fiscal year 2026 cost estimates that were 40 percent higher, driven by a $26.2 million commitment to address costs associated with NSF's relocation and added a new $57 million line item to pay out the long-term liability associated with previous capital improvements to the Weaver Building through an energy savings performance contract.

Recently, we learned that the first round of HUD employees were reportedly scheduled to begin moving the week of February 2, 2026, and yet, as recently as January 20, 2026, HUD leaders acknowledged that building systems were not yet fully operational, and could not answer staff questions about transit subsidies, transportation and parking plans, reimbursement for already paid parking at the Weaver Building, day care, and moving and transition coordination. Despite an August 7, 2025 email in which the HUD Deputy Secretary stated, "we are committed to keeping the HUD Family informed and supported throughout this process," reports indicate that communication with HUD staff has been severely limited and consistently last-minute since the June 2025 announcement. In fact, some employees were directed to report to the Eisenhower Avenue building with only one day's notice.

Over the past year, HUD operations have been upended by the loss of one-third of its workforce and immeasurable institutional knowledge, and morale is already at an all-time low. We have grave concerns that a hastily and irresponsibly executed move will exacerbate those challenges and HUD's ability to carry out its mission. To assist our oversight of HUD appropriations, to the greatest extent possible, we request that the GAO assess and report on the following:

- *Selection.* The selection of the Eisenhower Avenue location does not appear to have been based on a thorough analysis of alternatives.
    - What processes did decision makers use, including what processes were used to ensure the decision was in line with law and regulations?
    - Who made the final decision?
    - Have reported plans[7] or desires to demolish the Weaver Building and other nearby buildings played a role in the decision?
- *Alternatives*. HUD has indicated that three other buildings within the District of Columbia were considered (500 D Street SW, 1875 Pennsylvania Avenue, and the Cohen

[4] Senate Report 118-199. https://www.congress.gov/118/crpt/srpt199/CRPT-118srpt199.pdf.
[5] Senate Report 118-199. https://www.congress.gov/118/crpt/srpt199/CRPT-118srpt199.pdf.
[6] 41 CFR Part 102-85.212 (2024). These regulations have since been removed. *See* 90 Fed. Reg. 58,408 (Dec. 25, 2025) *and* 91 Fed. Reg. 2314 (Jan. 20, 2026)
[7] Roche, Daniel Jonas. The Architect's Newspaper. (2025, December 10). *Former HUD Headquarters, Cohen Building, and two other historic federal buildings may be demolished.* https://www.archpaper.com/2025/12/hud-headquarters-cohen-building-historic-federal-buildings-may-demolished/.

Building, along with maintaining HUD's lease at the Potomac Center Plaza), but provided limited detail about the extent of the agencies' analysis or attempts to correct any gaps for those alternatives.

- What requirements were provided to GSA for identifying an alternative location?
- How does HUD and GSA's alternatives analyses compare to typical analyses conducted for a move of this size and scale?
- What criteria were used to determine which buildings were presented to HUD?
- Are there other leases within the District of Columbia that meet those criteria?
- Were other alternatives considered, including but not limited to issuing a request for proposals for nearby leases[8] to seek the best price while minimizing disruptions - as was intentionally done for NSF?

- *Budget.* Were there missed opportunities for cost savings from moving only one agency rather than two? Did GSA review costs across the entire endeavor when making recommendations?
- *Legality.* On what legal basis does HUD believe that it can relocate outside the District of Columbia, and how does HUD plan to "maintain executive space" in the District of Columbia?
- *Obligations.* HUD did not notify the Committees that moving and setup expenses for officials "may exceed $5,000 per covered individual" until February 12, 2026 – well after the move was reportedly scheduled to begin and without any supporting detail. Did HUD obligate or expend amounts in excess of $5,000 for any Presidentially-appointed official in advance of the required notification[9]?
- *Forced Move.* What criteria were used to determine that this was a "forced move" under then-in-effect GSA regulations[10] and that HUD would be responsible for committing $26.2 million of its funds to NSF-related costs? How was the amount determined, and how does the process compare to past "forced moves"?
- *Continuity of Operations.* What plans have been made and communicated to HUD staff to ensure that HUD is able to maintain agency operations during the move?
- *Employee Rights.* What information has HUD provided to its union, and what is the scope and status of all grievances and statutory labor disputes related to the HUD space at the time that HUD began implementation of the move?

Thank you for your attention to this time-sensitive matter. Please keep our offices apprised of your review.

---

[8] U.S. General Services Administration. (2025, November 14). *GSA and NSF Announce NSF Headquarters Relocation to Modern, Right-Sized, and Mission-Ready Space.* https://www.gsa.gov/about-us/newsroom/news-releases/gsa-nsf-announce-hq-relocation-11142025

[9] Section 710 of title VII of division E, General Provisions – Government-wide, Consolidated Appropriations Act, 2026: Pub. L. 119-75.

[10] 41 CFR Part 102-85.212 (2024).

Sincerely,

Kirsten Gillibrand
Ranking Member
Subcommittee on
Transportation, Housing
and Urban Development, and
Related
Agencies

Jack Reed
Ranking Member,
Subcommittee on Financial
Services and General
Government

Chris Van Hollen
Ranking Member
Subcommittee on Commerce,
Justice, Science,
and Related Agencies